UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

LIBERTY MUTUAL FIRE INSURANCE        CIVIL ACTION
COMPANY

VERSUS                               NO: 08-5166

FLUOR ENTERPRISES, INC. AND          SECTION: R
KEITH MCLIN

**ORDER AND REASONS**

I.     **INTRODUCTION**

On August 25, 2006, Jean Joseph and her friend Bernard Mabry II walked into Joseph's newly leased FEMA trailer. Within moments, a flash fire erupted, fueled by an accumulation of propane gas. Both parties were significantly injured, and Mabry eventually died from his injuries.

After the fire, plaintiffs sued several parties in Orleans Parish Civil District Court, including Fluor Enterprises, a FEMA contractor that managed the delivery and installation of FEMA trailers following Hurricanes Katrina and Rita, and MMR Constructors, one of Fluor's haul-and-install subcontractors under the FEMA contract. Plaintiffs alleged, *inter alia*, that employees of Fluor and/or MMR failed to turn off the stove before

turning the trailer over to Ms. Joseph, failed to ensure the proper functioning of the stove, and failed to ensure the proper functioning of the trailer's liquid propane (LP) detector, which did not alarm on the day of the fire.

In December 2008, Fluor, certain Fluor insurers (Continental Casualty Company, Westchester Fire Insurance Company, and Great American Assurance Company), MMR, and MMR's insurer (Liberty Mutual Insurance Company) agreed to settle the *Joseph* plaintiffs' claims against Fluor and MMR for a total payment of $10 million,[1] with the insurers reserving various rights to recover from one another the sums paid in settlement.[2] In March 2010, the insurers agreed to settle the two *Mabry* lawsuits for a total of $2.75 million,[3] and again reserved certain rights to recover from the others.[4]

This coverage action followed. Liberty Mutual now seeks to recover $4.375 million from Fluor's insurers,[5] and Westchester

---

[1]     R. Doc. 260, Exh. 38.

[2]     R. Doc. 260, Exh. 39.

[3]     R. Doc. 260, Exh. 40.

[4]     R. Doc. 260, Exh. 41.

[5]     Fluor's insurers involved in this action include Westchester, Great American, and Endurance – the latter not having been a party to the underlying settlement agreements.

2

seeks to recover the same sum from Liberty Mutual, in accordance with the reservations of rights in the settlement agreements.

The dispute turns on two questions: (1) whether MMR owes indemnity to Fluor pursuant to the contract between those parties, and (2) whether Fluor is covered as an additional insured under MMR's excess insurance policy with Liberty Mutual. At the January 26, 2012 Pretrial Conference, the parties agreed and the Court ordered that there would be a Phase One trial on February 6, 2012 to resolve these questions.[6] The parties stipulated to a written record that included the complete depositions of Bob Funkhouser, Charles Whitaker, Steven Stanley, and Keith McLin; complete expert reports of any expert whose testimony was to be relied on at trial; and a complete copy of the Blanket Ordering Agreement.[7] Subsequently, the Court requested and received complete deposition testimony of Rodi Rispone and Jean Joseph, all of which is included in the record.[8] All other evidence comprising the written record for this phase of trial is attached as exhibits to the findings of fact and

---

[6]    R. Doc. 255.

[7]    *Id.*

[8]    R. Doc. 266.

conclusions of law submitted by plaintiff Liberty Mutual,[9] and defendants Westchester, Great American, and Endurance.[10]

The Phase One trial featured two live witnesses: Steven Stanley (called by Liberty Mutual) and Charles Whitaker (called by Westchester, Great American, and Endurance). After considering the entirety of the stipulated written record and the live testimony of both witnesses, the Court finds that MMR is not contractually bound to indemnify Fluor for its liabilities arising from the fire to the Joseph trailer. The Court also finds that Fluor is not covered as an additional insured under MMR's excess liability policy. These determinations are based on the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

---

[9]     R. Doc. 259.

[10]     R. Doc. 260. Pursuant to the January 26, 2012 Order, *see* R. Doc. 255, defendants were ordered to submit a single set of proposed findings of fact and conclusions of law, indicating which proposed findings are the proposed findings of all defendants and which are submitted by less than all defendants.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

## A.  Contractual Liability Coverage

In July 2005, Fluor contracted with FEMA to provide emergency assistance following natural disasters.[11] Under this Individual Assistance-Technical Assistance Contract (IA-TAC),[12] Fluor contracted with various subcontractors in the wake of Hurricanes Katrina and Rita. MMR was one of those subcontractors. The general terms of the agreement between Fluor and MMR are in a Blanket Ordering Agreement (BOA), which became effective on September 16, 2005.[13] In that contract, MMR agreed to haul and install FEMA trailers for Fluor and do certain inspection work in connection with the installations. MMR also agreed to defend and indemnify Fluor for injuries "arising directly or indirectly out of [the BOA] or out of any acts or omissions of [MMR] or its subcontractors":

> 28.1 Contractor [MMR] agrees to defend, indemnify and hold harmless Company [Fluor] and Owner, the affiliated companies of each, and all of their directors, officers, employees, agents and representatives, from and against any claim, demand, cause of action, liability, loss or expense arising:

---

[11]   R. Doc. 259, Exh. 1, 179:10-16.

[12]   *Id.*

[13]   R. Doc. 259, Exh. 2.

\*\*\*

28.1.3 From injury to or death of persons (including
employees of Company, Owner, Contractor and Contractor's
subcontractors) or from damage to or loss of property
(including the property of Company or Owner) arising
directly or indirectly out of this Contract or out of any
acts or omissions of Contractor or its subcontractors.
Contractor's defense and indemnity obligations hereunder
include claims and damages arising from non-delegable duties
of Company or Owner or arising from use by Contractor of
construction equipment, tools, scaffolding or facilities
furnished to Contractor by Company or Owner.[14]

Under the clear language of the BOA, these indemnity
provisions were to apply even if Fluor was concurrently
negligent, but not for damages caused *solely* by Fluor's
negligence:

28.2 Contractor's indemnity obligations shall apply
regardless of whether the party to be indemnified was
concurrently negligent, whether actively or passively,
excepting only where the injury, loss or damage was caused
solely by the negligence or willful misconduct of, or by
defects in design furnished by, the party to be indemnified.
Contractor's defense and indemnity obligations shall include
the duty to reimburse any attorneys' fees and expenses
incurred by Company or Owner for legal action to enforce
Contractor's indemnity obligations.[15]

MMR insured these liabilities by acquiring contractual
liability insurance under a commercial general liability (CGL)

---

[14]    *Id.* at BOA-55.

[15]    *Id.* at BOA-56.

policy[16] and an umbrella excess liability policy.[17] The latter policy, and the one relevant to this coverage action,[18] excludes contractual liability coverage except when

> [a]ssumed in a contract or agreement that is an insured contract provided the bodily injury, property damage, personal injury or advertising injury occurs subsequent to the execution of the contract or agreement.[19]

An "insured contract" here means:

> That part of any contract or agreement pertaining to your business under which you assume the tort liability of another party to pay damages because of injury or damage to a third person or organization. The contract or agreement must be made prior to such injury or damage. Tort liability means liability that would be imposed by law in the absence of any contract or agreement.[20]

Fluor's insurers argue that the indemnity provisions within the BOA constitute an "insured contract," and that Fluor is thus entitled to recover from MMR's insurer under its excess policy.

Ultimately, this contention requires the Court to interpret the BOA to determine whether the injuries to Joseph and Mabry

---

[16]     R. Doc. 259, Exh. 41.

[17]     R. Doc. 259, Exh. 40.

[18]     When the parties settled the underlying cases, Liberty Mutual reserved rights to recover from Fluor's insurers only the amounts paid under its excess policy. *See* R. Doc 260, Exh. 39; Exh. 41.

[19]     *Id.* at Umbrella-29.

[20]     *Id.* at Umbrella-36.

arose "directly or indirectly out of [the BOA] or out of any acts or omissions of [MMR] or its subcontractors." The Court will apply California law in this interpretation, as the BOA contains a choice-of-law provision calling for the application of California law,[21] and the parties have offered no reason why California law should not apply. *See Mitsui & Co. (USA) v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997) ("The Supreme Court has consistently held forum-selection and choice-of-law clauses presumptively valid.").

Under California law, the parties seeking contractual indemnity bear the burden of proving that the indemnity agreement applies. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1195 (C.D. Cal. 2003) (applying California law and finding that "[a] plaintiff suing to recover on an indemnity contract must prove, *inter alia*, that it has suffered a loss within the meaning of the parties' indemnification agreement, as well as the amount of the loss sustained"). In applying an indemnification provision, the Court must examine the facts involved in the underlying tort suit. This follows because although "the duty to defend arises upon proper tender of a defense by the indemnitee of a claim *alleging* facts that would

---

[21]     R. Doc. 259, Exh. 2, BOA-61.

give rise to a duty to indemnify," *Desilva Gates Constr., L.P. v. M. Bumgarner*, 2010 Cal. App. Unpub. LEXIS 6099, *32 (Cal. App. 1st 2010) (emphasis in original) (citing *Crawford v. Weather Shield Mfg., Inc.*, 44 Cal. 4th 541 (Cal. 2008)), the duty to indemnify "arises upon proof that the indemnity is actually owed." *Id.*, at *31-32 ("[T]he actual imposition of the duty to indemnify in this case required inquiry into and resolution of disputed facts."). Thus, Fluor's insurers must demonstrate that the BOA's indemnity provisions cover the injuries that Joseph and Mabry suffered in this case; otherwise, those provisions will not constitute an "insured contract," and Liberty Mutual's excess policy will not provide contractual liability coverage.

California courts construe indemnity agreements under the same rules that govern the interpretation of other contracts. *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1048 (Cal. App. 2d 2002). Accordingly, the indemnity provisions of the BOA must be interpreted to give effect to the mutual intention of the parties, *id.* (citing Cal. Civ. Code § 1636), determined by the "clear and explicit" language of the contract. *Id.* (citing Cal. Civ. Code §§ 1638, 1639). Unless given some special meaning by the parties, the words of a contract are to be understood in their "ordinary and popular sense." *Id.* (citing Cal. Civ. Code §

1644).

Here, MMR undertook an expansive indemnity obligation, agreeing to indemnify Fluor not merely for liabilities arising out of MMR's "acts or omissions," but also for those "arising directly or indirectly out of [the BOA.]" California courts consistently give a broad interpretation to the language "arising out of," requiring only a minimal but-for causal connection between the ultimate harm and the indemnitor's duties under the contract. *See Pardee Constr. Co. v. Jeld-Wen, Inc.*, 2004 Cal. App. Unpub. LEXIS 2552, *24 (Cal. App. 4th 2004); *NNN 4241 Bowling Green 10 v. Ferguson Janitorial & Carpet Cleaning*, 2006 Cal. App. Unpub. LEXIS 6655, *10 (Cal. App. 3d 2006) ("The few courts that have addressed this issue agree the phrase ['arising out of'] requires a showing of cause in fact, or, in other words, 'but for' causation."). Similarly, California courts construe language equivalent to "arising directly *or indirectly*" out of the contract to require but-for causation. *See Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*, 53 Cal. App. 4th 500, 505 (Cal. App. 2d 1997) (finding that an indemnity obligation for a loss that "arises out of or is in any way connected" with the performance of work requires proof of causation). *See also id.* at 506 ("[T]he term 'occur directly or indirectly as the result of the Contractor's prosecution of the work' ... requires only ... a

'but for' causation test[.]") (quoting *Commander v. BASF
Wayondotte Corp.*, 978 F.2d 924, 927 (5th Cir. 1992)). Negligence
of the indemnitor is *not* required for an indemnity obligation to
lie, as "courts will enforce indemnity agreements even for losses
caused by acts over which the indemnitor had no control." *Id.* at
505. "Parties to an indemnity contract enjoy 'great freedom of
action' in allocating risk," subject only to public policy
limitations. *Id.* at 506. Thus, "[w]hen the parties knowingly
bargain for the protection at issue, the protection should be
afforded." *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal. 3d
622, 633 (Cal. 1975).

   *Application*

   Determining whether the fire and resulting injuries arose
out of the BOA requires examination of the events leading up to
the fire, particularly those involving MMR's work. On July 14,
2006, after MMR had hauled and installed Joseph's trailer, Fluor
employee, Reginald McCoy, and MMR employee, Steven Stanley,
conducted a Quality Control / Quality Assurance (QC/QA)
inspection of the trailer.[22] Although Stanley did not recall the
specifics of this particular inspection at trial, he explained

---

[22]    R. Doc. 259, Exh. 6.

his standard QC/QA routine and stressed that, although not part of his work order, he would sometimes perform tasks inside the trailer at the request of the accompanying Fluor inspector.[23] One of those tasks was testing the LP detector for basic functionality.[24] Certain models of detector did not come equipped with a "test" button, and when the Fluor inspector asked Stanley to test this type of detector, he would use a standard cigarette lighter to release a stream of butane gas into the detector's sensor[25] – the test selected by Fluor based on the manufacturer's instructions.[26] The Joseph trailer came equipped with this model of detector, and based on the documentation from that inspection, Stanley concluded that either he or McCoy would have tested the detector in like fashion.[27] Stanley was *not* charged with checking the LP gas system of the Joseph trailer for leaks.[28] Rather, after the gas appliances were checked for functionality, he disconnected the propane tanks and placed them inside the

---

[23]    Test. of Steven Stanley.

[24]    *Id.*

[25]    *Id.*

[26]    Test. of Charles Whitaker; R. Doc. 259, Exh. 34.

[27]    Test. of Steven Stanley.

[28]    R. Doc. 259, Exh. 8, 55:21 – 56:5.

trailer.[29] After July 14, 2006, MMR had no further contact with or duties relating to the Joseph trailer.[30]

Even though MMR completed its work, the Joseph trailer was not ready for move-in until Ms. Joseph was "leased-in," which took place five weeks later.[31] Fluor itself performed the lease-in in this case.[32] As part of the standard lease-in procedure, a lease-in inspector performed certain tests to determine that the electricity was connected, the propane gas system was not leaking gas, and all alarms - including the gas alarm - functioned properly.[33] The lease-in inspector also educated the new resident about the workings of her trailer. Keith McLin, a Fluor employee, leased Ms. Joseph into her trailer on August 22, 2006 - three days before the fire.[34] Although Joseph testified at her deposition that the lease-in in fact occurred mere minutes before the fire on August 25,[35] the Court credits McLin's testimony,

---

[29]    *Id.* at 55:14 - 58:17.

[30]    R. Doc. 259, Exh. 10, Response to RFA No. 3.

[31]    R. Doc. 259, Exh. 12.

[32]    *Id.*

[33]    R. Doc. 259, Exh. 11, 64:6 - 67:18, 70:11 - 78:19, 84:10 - 85:17.

[34]    R. Doc. 259, Exh. 12.

[35]    R. Doc. 266, Exh. B, 140:9 - 143:11.

13

which is corroborated by the lease-in documentation bearing both McLin's and Joseph's signatures and dated August 22, 2006.[36] Documentation from the lease-in indicates that McLin performed a leak test on the LP gas system and determined that it did not leak.[37] In addition, McLin tested the trailer's range and LP detector, and both appeared to be functioning properly.[38] McLin tested the LP detector with a butane lighter as suggested by the manufacturer of the device.[39]

Three days after the lease-in, Jean Joseph, accompanied by her friend Bernard Mabry, entered the trailer and smelled gas.[40] She testified at her deposition that Mabry "went to the stove" upon entering the trailer, at which point the fire erupted.[41] Joseph heard no alarm as she entered the trailer.[42] Investigators with the New Orleans Fire Department concluded that Mabry recognized the stove as the source of the gas and turned the

---

[36]    R. Doc. 259, Exh. 11, 55:17 - 56:7; Exh. 12. The Court also notes that Joseph admitted experiencing memory loss as a result of the fire. R. Doc. 266, Exh. B, 8:4-16.

[37]    R. Doc. 259, Exh. 12; Exh. 11, 70:23 - 78:19.

[38]    R. Doc. 259, Exh. 12; Exh. 11, 66:8-13, 84:10-12.

[39]    R. Doc. 259, Exh. 11, 84:12 - 85:17; Exh. 34.

[40]    R. Doc. 266, Exh. B, 148:19-25.

[41]    *Id.*

[42]    *Id.* at 213:9 - 214:8.

ignitor knob in a mistaken attempt to cut off the gas supply.[43]

The Bureau of Alcohol, Tobacco, and Firearms reached the same

conclusion,[44] as did several experts who offered opinions in this

and the underlying litigation.[45]

The Court finds that the accumulation of gas in the trailer

was caused when someone turned on the gas knob on the stove and

failed to turn it off.[46] This conclusion is overwhelmingly

supported by the evidence, including the investigations of the

New Orleans Fire Department,[47] the Bureau of Alcohol, Tobacco,

---

[43]    R. Doc. 259, Exh. 14, p. 9.

[44]    R. Doc. 259, Exh. 15, p. 4.

[45]    R. Doc. 259, Exh. 17, 40:12-18; Exh. 18, 46:4-7; Exh. 23, 23:24 – 25:14; Exh. 26, 88:11-14; Exh. 27, p. 5-6.

[46]    To the extent Fluor's insurers argue that the similarities in size, shape, and color between the stove's ignition knob and the gas burner knobs contributed to the fire and triggered MMR's indemnity obligation, the Court rejects the contention. Putting aside that MMR had no obligations with respect to the design, manufacture, selection, or installation of the stove, *cf. Cont'l Heller*, 53 Cal. App. 4th at 506 (indemnitor responsible for selecting and installing valve that malfunctioned and caused explosion), the Court finds no credible evidence that the configuration of the knobs confused Mr. Mabry and caused him to produce the spark setting the fire. There is certainly no firsthand evidence that this occurred. Further, the ignition knob was marked in a manner different from the gas knobs, and the corresponding image on the stove clearly depicted the former knob's function. *See* R. Doc. 259, Exh. 27, fig. 61.

[47]    R. Doc. 259, Exh. 14, p. 9.

and Firearms,[48] and virtually all of the retained experts[49] - including Fluor's own.[50] There is no evidence of a leak or other malfunction in the stove or LP gas system.[51]

Further, the Court finds that the gas was left on for a few days before the fire. The gas range contained three burners - two that released gas at a rate of 6500 BTU/hour, and a larger, central burner that released gas at 9100 BTU/hour.[52] The trailer fuel gas system included two 30-pound LP gas cylinders, filled with 80% liquid propane - the maximum allowable under the Liquified Petroleum Gas Code.[53] Post-fire investigation revealed that one of the tanks had been depleted to 20% capacity; thus, approximately 60% of the liquid volume of one cylinder was used before the incident.[54] Based on this information, the experts generally agreed that the amount of propane depletion was consistent with a 72 hour release of gas from the range. Larry

---

[48]    R. Doc. 259, Exh. 15, p. 4.

[49]    R. Doc. 259, Exh. 16, p. 2; Exh. 22, p. 5-6; Exh. 25, p. 4. ; Exh. 27, p. 5.

[50]    R. Doc. 259, Exh. 21, p. v; Exh. 18, 45:19 - 46:3.

[51]    R. Doc. 259, Exh. 15, p. 4; Exh. 29, p. 2.

[52]    R. Doc. 259, Exh. 25, p. 3; Exh. 24, p. 6-7.

[53]    R. Doc. 259, Exh. 24, p. 5.

[54]    *Id.*

Thatcher, a propane consultant, found that the estimated 5.64 gallons of missing fuel, depleted over 72 hours, corresponds to an average depletion rate of 7167 BTU/hour.[55] Jean McDowell, a fire science consultant, estimated that approximately 5.3 gallons of propane was used – indicating a propane emission rate of 6757 BTU/hour if the gas were left on for 72 hours.[56] And Seth Bayer, a consulting engineer, determined a discharge rate of 7282 BTU/hour over a three day period, based upon his estimation of 5.7 gallons of depleted propane.[57] All of this evidence is consistent with a stove knob having been left open for three days.

Gregory Haussmann, Fluor's expert, disputed this conclusion, noting that the trailer did not suffer any overpressure damage, which indicated that a limited quantity of gas was in the trailer at the time of the fire.[58] He asserted that if a burner had been left on from the time of the lease-in, more than enough propane would have been released to fill the trailer completely with an

---

[55]    R. Doc. 259, Exh. 25, p. 3.

[56]    R. Doc. 259, Exh. 24, p. 6-7.

[57]    R. Doc. 259, Exh. 19, p. 2.

[58]    R. Doc. 259, Exh. 21, p. v.

17

ignitable propane/air mixture.[59] He contended the magnitude of the fire and lack of explosion damage was instead consistent with a release of propane for "a relatively short period of time (an hour or less)."[60] Critically, he did not explain the significant loss of propane, instead relying purely on the degree of fire damage. And another expert explained that air exchange with the trailer's exterior would have rendered only a small volume of the trailer – here, the kitchen area – within a range at which the atmosphere would be flammable, even after a constant discharge for several days.[61] In any event, there was no evidence that connected MMR's contract to the open gas knob on the stove. MMR had no contact with the trailer for five weeks before the fire, and Stanley disconnected the propane source when he finished the QC/QA inspection.

Although the knob was most likely left open for several days before the fire erupted, the Court finds that this was not the only cause of the injuries to Joseph and Mabry. There is also evidence that the LP detector did not alarm, despite the presence

---

[59]    *Id.*

[60]    *Id.*

[61]    R. Doc. 259, Exh. 24, p. 7.

of flammable concentrations of gas in the trailer,[62] and further evidence that the detector did not operate according to manufacturer's specifications. During post-fire investigative testing, a calibration gas containing propane at .25 its Lower Explosive Limit (LEL) was introduced to that LP detector through a hose and diffuser endpiece, with the endpiece placed directly over the sensor.[63] As an Underwriter Laboratories (UL) registered device, the detector was required to alarm at this concentration,[64] yet the detector never alarmed during the six minutes of gas flow.[65] When an exemplar detector underwent an identical test on the same day, it alarmed after one minute of gas exposure.[66] Subsequent tests of the Joseph trailer's LP detector also resulted in failure. Notably, the detector *did* alarm when tested with a butane lighter[67] – the test used by Fluor based on the manufacturer's recommendation.[68]

The Court finds that a properly functioning detector would

---

[62]    R. Doc. 259, Exh. 14; Exh. 15.

[63]    R. Doc. 259, Exh. 21, p. 7.

[64]    *Id.* at 8.

[65]    *Id.* at 7-8.

[66]    *Id.*

[67]    *Id.*

[68]    Test. of Charles Whitaker; R. Doc. 259, Exh. 34.

have alarmed before the fire erupted. It does so despite Liberty Mutual's contention that a properly functioning detector would not have sensed the presence of gas emitted from the stove because such a mixture of gas and air would be too light to reach the detector installed a couple of feet below the burners. Liberty Mutual relies on the manual for the CCI LP detector, which states:

> It is very important to be aware of the difference between a gas leak versus gas escaping from an unlit, open burner. Pure propane vapors from a leaking pipe or gas fitting are heavier than air and will build up their heaviest concentration at the leak and float down until they mix with air. Gas from open burners is intentionally mixed with air to induce burning and will dissipate into the air.
>
> When mixed with air, the gas becomes only marginally heavier than air and will expand outward. If a gas burner is left on, the area around the burner, range, and adjoining counter space will be combustible and can cause injury and damage if ignited. This condition will exist for an extended time period and eventually the gas will reach the detector's location and be detected. This detector only indicates the presence of propane gas at its sensor. Combustible levels of propane gas may be present in other areas.[69]

Significantly, the CCI literature notes that if a gas burner is left on, "*eventually* the gas will reach the detector's location and be detected" (emphasis added). Here, the most likely account of the events is that the gas burner was left on for a full *three days*, yet the detector failed to alarm at any point

---

[69]    R. Doc. 259, Exh. 34.

during that period. Further, the detectors are designed to be sensitive enough to alert for gas concentrations that are *not* yet dangerous: gas at .25 LEL, after all, must grow four times more concentrated before it becomes flammable. Leaner gas concentrations just above .25 LEL at the LP detector's sensor should trigger the alarm, alerting for potentially richer concentrations nearby.

In this case, for an estimated three days, the stove top, no more than two to three feet directly above the detector's sensor,[70] emitted a concentration of propane that was at a minimum *four times richer* than that at which the detector should have alarmed. There was some fire damage to items not far off the floor,[71] indicating the presence of flammable gas at those levels. The Court finds that, even accounting for the density of the propane mixture, it most likely reached the LP detector in sufficient concentration that a properly functioning device would have alarmed accordingly. It stands to reason that a sounding alarm could have alerted Joseph and Mabry not to enter the gas-filled trailer, or drawn the attention of neighbors had it sounded earlier.

---

[70]    R. Doc. 259, Exh. 27, fig. 23A.

[71]    R. Doc. 259, Exh. 27, p. 3-4.

That the LP detector's failure was a contributing cause of the fire does not mean that the fire arose directly or indirectly out of the BOA unless MMR's work under the contract was a but-for cause of the injuries to Joseph and Mabry. It is undisputed that MMR was not obliged to design, install, or procure the LP detector since, like other appliances, it was already installed in the trailer when MMR took custody from Fluor.[72] But whether MMR was responsible for *testing* the detector is another matter, and one that requires this Court to examine the entirety of the Fluor-MMR agreement.

*MMR's Scope of Work*

While the BOA was an overarching base contract defining the rights and obligations of the parties with respect to MMR's work, MMR was not actually authorized or required to perform specific work until Fluor issued individual Task Order Releases,[73] each containing a specific scope.[74] On January 7, 2006, Fluor issued a Task Order Release describing MMR's work as follows:

[MMR] shall supply all supervision, labor, equipment, tools,

---

[72] Test. of Charles Whitaker.

[73] R. Doc. 259, Exh. 2, BOA-1-2; Exh. 1, 231:13 - 232:1; Test. of Charles Whitaker.

[74] R. Doc. 259, Exh. 1, 232:10-17.

> materials, protective equipment and all items of expense
> necessary to perform the Work described below:
>
> 1.1 Hauling and Installation services of Manufacturered
> Homes, Travel Trailers, and Park Models as directed by
> Company's representatives throughout the state of
> Louisiana.[75]

MMR was to conduct its work under the Task Order Release in accordance with certain exhibits incorporated into the Release.[76] Among those explicitly incorporated was Exhibit 7 - "Travel Trailer Installation"[77] - which set forth the specific tasks that MMR was required to complete. Its duties included exterior installation functions such as blocking and leveling the trailer, anchoring and strapping it, and installing it to sewer lines and gas lines.[78] In addition, MMR was required to "Make Travel Trailer Ready for Occupancy (RFO),"[79] which included the duty to "Test Appliances and Appurtenances" as follows:

> (a) Activate, test and make any necesssary minor repairs to
> the refrigerator, range, furnace, air conditioner, and
> water heater for proper operations. Adjust pilots and
> burners, change orifices, water heater elements, etc., as
> needed;

---

[75]    R. Doc. 259, Exh. 5.

[76]    R. Doc. 260, Exh. 3.

[77]    R. Doc. 260, Exh. 5.

[78]    *Id.*

[79]    *Id.*

(b) Test smoke detector and replace if faulty. Defective smoke detectors provided by FEMA or manufacturer upon receipt of damaged one; and

(c) Test exhaust fans for proper operation, repair as needed.[80]

Absent from the list is any explicit mention of the LP detector. Fluor's insurers argue that testing the detector is a requirement of the contract nevertheless, as the "etc." in subpart (a), according to defendants, required MMR to test the detector. Defendants also argue that the LP detector was an unmentioned "appurtenance" to the range. The argument fails for several reasons. First, the contract lists the appliances to be checked: "the refrigerator, range, furnace, air conditioner, and water heater." The next part instructs MMR what to do with items appurtenant to those appliances: "Adjust pilots and burners, change orifices, water heater elements, etc., as needed." Each of those listed items is a component of a larger appliance and integral to its operation. For example, a water heater element is one part of a water heater, and a burner is one part of a range. But an LP detector is not an "appurtenance" to the stove. The two are manufactured and sold by different companies (CCI and Maytag, respectively), the detector is not attached to or part of the

---

[80]    *Id.*

24

stove, and the range does not require the LP detector in order to function properly. Unlike the listed items, the LP detector is not an accessory to the stove, nor does it fit the common definition of an "appurtenance": "Something that belongs or is attached to something else." *See* BLACK'S LAW DICTIONARY 118 (9th ed.). Furthermore, the LP detector, if it were to be included in the list of appliances and appurtenances to be tested, would more naturally fit in subpart (b) where the smoke detector is mentioned. Yet that subpart includes no reference to the LP detector, nor even an "etc." to signify an obligation more extensive than testing the smoke detector and replacing it if necessary.

Defendants also contend that other documents provide additional specifics as to the responsibilities of the MMR QC/QA inspector under the BOA. Specifically, defendants point to a Fluor form, the "QC/QA RFO Checklist,"[81] which lists the various requirements of Fluor's inspectors. One item on that list reads, under a heading "Appliances and Appurtenances": "LP detector installed and operates properly."[82]

Critically, however, that RFO Checklist is nowhere

---

[81]   R. Doc. 259, Exh. 9.

[82]   *Id.*

incorporated into the BOA. The first page of the BOA states that

the BOA, including all attachments, exhibits, drawings,

specifications, and documents referred to therein,

> sets forth the entire Contract and agreement between the
> Parties pertaining to the Scope of Work (hereinafter the
> "Work") and supersedes all inquiries, proposals, agreements,
> negotiations and commitments, whether written or oral, prior
> to the date of execution of this Contract, pertaining to said
> Work or this Contract. The provisions of this Contract may be
> changed only by writing executed by the Parties to this
> Contract. Trade Custom and trade usage are superseded by this
> Contract and shall not be applicable in the interpretation of
> performance of this Contract.[83]

The BOA was *Fluor's* document, several hundred pages in its

original form, and any changes had to be in a writing executed by

the parties. Fluor's Program Manager testified that the

attachments specifically incorporated into the BOA could "fill up

probably a corner of [the] room,"[84] yet nowhere was he or anyone

else able to point to a provision that incorporated the RFO

Checklist into the BOA. Although Whitaker testified that Fluor

provided the Checklist to MMR personnel *before* MMR made its bid

for the haul-and-install subcontract,[85] this document was never

incorporated into the contract documents. Moreover, the contract

---

[83]    R. Doc. 259, Exh. 2, BOA-1.

[84]    Test. of Charles Whitaker.

[85]    *Id.*

26

expressly negated the efficacy of any documents not incorporated, specifically those used in negotiations or proposals that were not included in the contract. That Stanley or other MMR inspectors occasionally performed certain tasks on the Checklist at the request of Fluor's inspectors does not transform the Checklist into a contractual obligation: MMR's and Fluor's inspectors were not authorized to alter the terms of the contract, either by word or by deed.

Because the BOA, with all its incorporated documents, does not once mention the LP detector, much less state an obligation concerning the same, testing the detector is outside the scope of the work that MMR contracted to do. Nothing in MMR's scope of work was a but-for cause of the injuries in this case.

Even if the Court found (which it does not) that MMR *was* contractually bound to test the detector, it does not follow that Joseph's and Mabry's injuries "arose out of" that obligation unless those injuries were causally connected to the work that MMR was actually required to perform. *See, e.g., Cont'l Heller*, 53 Cal. App. 4th at 505 (requiring proof of causation with respect to an agreement to indemnify for a loss that "arises out of or is in any way connected" with the performance of work under the contract). Stated another way, only if the injuries would not have occurred but for some aspect of MMR's work would MMR's

indemnity obligation arise. The Court has already discussed the failure of the LP detector to alarm on the day of the fire, its subsequent failure to alarm as required when tested with propane concentrations at .25 LEL, and its *success* in alarming when tested using the same butane lighter test employed by the QC/QA inspectors and the lease-in inspectors, and recommended by the manufacturer. A jet of butane at close range exposes the LP detector to a much higher concentration of gas than .25 LEL of propane, at which the detector was actually required to alarm. The Court finds the lighter test was capable of determining basic functionality, the only level of performance at which Fluor or MMR was required to test any appliance or device.[86] The Court further finds that the test was improperly designed to detect whether the LP alarm was operating according to the sensitivity standards required of the manufacturer. Consequently, whether or not MMR performed the test that defendants argue was required by contract is of no moment, as that test would not have made any difference in exposing a latent defect and preventing the fire.

FEMA did not require Fluor to uncover latent product defects in devices manufactured by others and installed in the trailer

---

[86]    Test. of Charles Whitaker.

before Fluor took custody.[87] Nor did Fluor pass on any such duty to its subcontractor, MMR.[88] Fluor's QC/QA standards for its own personnel included the butane lighter test.[89] It was the test prescribed in manufacturer's manual,[90] and the test used by the company that assembled the Joseph trailer and installed the detector.[91] In fact, *nowhere* in the record is there any indication that another, more effective test was to be used by any party in connection with the trailer.[92] Even if MMR had an obligation to test the LP detector, which it did not, satisfaction of the obligation that Fluor contends existed was not causally linked with the fire and the resulting injuries. The

---

[87]    *Id.*

[88]    *Id.*

[89]    Test. of Charles Whitaker.

[90]    R. Doc. 259, Exh. 34.

[91]    R. Doc. 259, Exh. 30, 47:21 – 48:7, 53:3 – 54:10; Exh. 44.

[92]    There is no suggestion that MMR was required to perform design engineering tests on the detector or any other device inside the trailer. The other tests that Fluor required were basic – designed to determine simple functionality and not to uncover latent product defects. Although Fluor's insurers point to an attachment to the BOA providing that the ultimate responsibility for quality assurance would rest with MMR, *see R.* Doc. 260, Exh. 10, BOA-145, that provision cannot be read to require of MMR what was not even required of Fluor itself under its FEMA contract.

fire therefore did not "arise out of" the BOA, and MMR is not
liable to Fluor for indemnity. *Cf. Ferguson Janitorial*, 2006 Cal.
App. Unpub. LEXIS 6655, at *8, 17 (no but-for causation, and
therefore no indemnity obligation, based on agreement to
indemnify party for losses "arising out of th[e] Contract or the
performance of the Work by [the indemnitor]"); *Desilva Gates*,
2010 Cal. App. Unpub. LEXIS 6099, at *10 (no but-for causation,
and therefore no indemnity obligation, based on agreement to
indemnify party for losses "arising out of or in connection with
[indemnitor's] operations to be performed under this
Agreement.").

**B.    Coverage as an Additional Insured**

Without contractual liability coverage, Fluor (and its
insurers) nevertheless may recover from Liberty Mutual if Fluor
qualifies as an additional insured under MMR's excess liability
policy. To determine whether Fluor is covered, the Court must
examine MMR's excess policy, and the contract provisions
requiring that coverage.

The BOA required that MMR obtain several different types of
insurance, each with different specifications:

29.1 Contractor shall, at its sole cost, obtain and maintain
in force for the duration of the Contract (including the
guarantee period set forth in Article 1.0) insurance of the

following types, with limits not less than those set forth below:

29.1.1 Workers' Compensation Insurance, including occupational illness or disease coverage, in accordance with the laws of the nation, state, territory or province having jurisdiction over Contractor's employees and Employer's Liability Insurance with a minimum limit of $1,000,000 per accident and, for bodily injury by disease, $1,000,000 per employee. Contractor shall not utilize occupational accident or health insurance policies, or the equivalent, in lieu of mandatory Workers' Compensation Insurance or otherwise attempt to opt out of the statutory Workers' Compensation system.

29.1.2 **Commercial General Liability Insurance ('Occurrence Form') with a minimum combined single limit of liability of $1,000,000 each occurrence for bodily injury and property damage; with a minimum limit of liability of $1,000,000 each person for personal and advertising injury liability.** Such policy shall have a products/completed operations liability limit of not less than $2,000,000 and a general aggregate limit of not less than $2,000,000, which general aggregate limit will be provided on a per project basis by means of ISO Endorsement CG 25 03 11 85. The products/completed operations liability coverage shall be maintained in full force and effect for not less than three (3) years following completion of Contractor's services. **The policy shall be endorsed to name Company and Owner, including their respective affiliates, the financing parties and the respective officers, directors and employees of each, as additional insureds.** Such endorsement shall be made upon ISO Endorsement CG 20 10 11 85, "Additional Insured - Owners, Lessees or Contractors (Form B)". Current endorsements providing coverage identical to that provided under ISO Endorsement 20 10 11 85 and coverage limits identical to those provided under ISO Endorsement CG 25 01 11 85 may be employed by Contractor's Commercial General Liability Insurer to meet the above requirements.

29.1.3 Automobile Liability Insurance covering use of all owned, non-owned and hired automobiles with a minimum combined single limit of liability for bodily injury and

property damage of $1,000,000 per occurrence. This policy shall be endorsed to name Company and Owner, including their respective affiliates, directors and employees, as additional insureds.

29.1.4 If Contractor will utilize tools or equipment in the performance of the services under the Contract, Equipment Floater Insurance (Tools and Equipment Insurance) covering physical damage to or loss of all major tools and equipment, construction office trailers and their contents, and vehicles for which Contractor is responsible, throughout the course of the Work.

29.1.5 ***Umbrella Liability Insurance providing coverage limits in excess of that required in Subsections 29.1.1 Employers Liability, 29.1.2 General Liability and 29.1.3 Automobile Liability with a combined single limit of liability of not less than $4,000,000 per occurrence.***[93]

Pursuant to the agreement, MMR obtained its CGL and excess policies from Liberty Mutual. The CGL policy contains a blanket additional insured amendment that extends coverage in accordance with the following provision:

SECTION II - WHO IS AN INSURED is amended to include as an insured any person, organization, state or other political subdivision, trustee or estate for whom you have agreed in writing to provide liability insurance. But:

The insurance provided by this amendment:

1. Applies only to "personal injury" or "property damage" arising out of (a) "your work" or (b) premises or other property owned by or rented to you[.][94]

---

[93]    R. Doc. 259, Exh. 2, BOA-56-57.

[94]    R. Doc. 259, Exh. 41, CGL-44.

In the above, "your work" means:

> 1.  Work or operations performed by you or on your behalf; and
> 2.  Materials, parts or equipment furnished in connection with such work or operations.[95]

It includes:

> 1.  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and
> 2.  The providing of or failure to provide warnings or instructions.[96]

MMR's excess policy provides that Liberty Mutual will "pay those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages because of ... personal injury ... to which this policy applies."[97] This policy includes as an insured:

> Any other insured included in or added to an underlying policy, but not for broader coverage than is available to such insured under the underlying policy. However, if such other insured is so included or added pursuant to written agreement to provide insurance, then this policy applies only to the scope of coverage and limits of insurance required by such written agreement. In no event will coverage for such other insured exceed the scope of coverage or limits of insurance afforded by this policy.[98]

---

[95]   R. Doc. 259, Exh. 41, CGL-31.

[96]   *Id.*

[97]   R. Doc. 259, Exh. 40, Umbrella-28.

[98]   R. Doc. 259, Exh. 40, Umbrella-34.

As the first sentence in the quoted excess policy provision requires that coverage for an additional insured shall not be broader than is available under the underlying policy, the scope of Fluor's excess coverage is limited to personal injuries "arising out of ... '[MMR's] work'" - the same provision in place under the CGL policy. At issue is whether Fluor is indeed covered as an additional insured under MMR's excess policy, despite this limitation.

Whether the fire arose out of MMR's "work" is related to whether it arose out of the BOA. There are, however, two distinctions: First, while the BOA specifically selects California law to govern any dispute, Liberty Mutual's insurance policies contain no such choice-of-law clause, and Louisiana law will therefore apply to their interpretation. Second, "arising directly or indirectly out of the contract" and "arising out of your work" are not identical provisions; the first, with the inclusion of "directly or indirectly," evidences an intent to provide broader indemnity, even if both require but-for causation.

Despite these distinctions, however, the result is the same: The personal injuries to Joseph and Mabry did not arise out of MMR's work. First, MMR's work did not cause the gas to flow into the trailer from the stove. There is no evidence that the knob

was left open for more than a few days, and MMR's last involvement with the trailer predated the fire by five weeks. Second, MMR's "work or operations" did not include any obligations regarding the LP detector, much less to devise a test above and beyond what Fluor provided. Third, MMR did not furnish any "materials, parts or equipment" that gave rise to the injuries; the LP detector was already selected and installed before MMR took custody of the trailer. Fourth, MMR made no "warranties or representations" with respect to its work that occasioned the injuries. And finally, MMR was not tasked with providing "warnings or instructions" that in any way resulted in the injuries to Joseph and Mabry.

Under Louisiana law, the ordinary meaning of the text in an insurance policy governs in the absence of an absurd result. *Williamson v. J.C. Penney Life Ins. Co.,* 226 F.3d 408, 409 (5th Cir. 2000). And here, the ordinary meaning is clear: As the fire is in no way connected with MMR's work on the Joseph trailer, Fluor is not covered under MMR's excess liability policy.

**III. CONCLUSION**

For all of the foregoing reasons, Fluor's insurers are not entitled to indemnity from Liberty Mutual, nor may they recover from Liberty Mutual under MMR's excess policy.


New Orleans, Louisiana, this 17th day of February, 2012.

_Sarah Vance_
_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE