# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-30541

LIBERTY MUTUAL INSURANCE COMPANY,

United States Court of Appeals
Fifth Circuit

**FILED**

November 11, 2014

Lyle W. Cayce
Clerk

Plaintiff - Appellee

v.

WESTCHESTER FIRE INSURANCE COMPANY,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:08-CV-5166

Before STEWART, Chief Judge, and DENNIS and ELROD, Circuit Judges.
JAMES L. DENNIS, Circuit Judge:*

This case involves an insurance-coverage dispute. Fluor Enterprises, Inc. ("Fluor") contracted with the Federal Emergency Management Agency ("FEMA") to manage the delivery and installation of FEMA trailers following Hurricanes Katrina and Rita. Fluor subcontracted with MMR Constructors, Inc. ("MMR") to haul and install the trailers. As part of the agreement between Fluor and MMR, MMR agreed to indemnify Fluor for any injuries arising, directly or indirectly, out of the parties' contract itself or out of MMR's acts or

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-30541

omissions. As relevant here, Fluor insured its liabilities through Westchester Fire Insurance Co. ("Westchester") and MMR insured its liabilities through Liberty Mutual Insurance Co. ("Liberty").

A flash fire occurred in one of the trailers that MMR had hauled and installed, injuring the trailer's inhabitant and killing her friend. The fire was caused in part by the failure of the trailer's liquid-propane ("LP") detector to alarm. The injured parties sued Fluor, MMR, and their insurers. Those suits settled. Now, in this case, Liberty seeks reimbursement for its settlement payments from Westchester, arguing that MMR was not responsible for any of the injuries. The issue before us is whether MMR was required, as part of its contract with Fluor, to test the LP detector and whether its failure to do so was a but-for cause of the injuries.

Following a bench trial, the district court concluded that MMR was under no such obligation. Consequently, the district court determined that MMR was under no obligation to indemnify Fluor, defeating coverage, and that Fluor was not covered under an additional-insured provision contained in MMR's insurance policies with Liberty. We conclude that MMR was not obligated to test any trailer's LP detector and the record supports the conclusion that Fluor did not in fact direct MMR to do so with respect to the particular trailer in which the fire occurred. Accordingly, we AFFIRM the judgment of the district court.

## I.   BACKGROUND

### A.   Fluor's Contracts with MMR

In July 2005, Fluor contracted with FEMA to provide emergency housing assistance following natural disasters. Pursuant to its contract with FEMA, Fluor contracted with various subcontractors, including MMR, following Hurricanes Katrina and Rita. The general terms of the agreement between Fluor and MMR were contained in a document titled the "Blanket Ordering

2

No. 13-30541

Agreement" (the "BOA"), which went into effect on September 16, 2006. Under the BOA, MMR agreed to haul and install FEMA trailers for Fluor.

The BOA provided that "[p]erformance of the Work under this Contract will be authorized and funded through Individual Task Order Releases (hereinafter 'Releases')." The BOA described the "scope of work" as supplying "all services, things, and items of expense necessary to perform the Work" but noted that "[e]ach Release will contain a specific Scope." Under Part III of the BOA, which described the "general terms" of the BOA—but not under Part I, which described the scope of work—MMR was obligated to "inspect all materials, supplies and equipment which are to be incorporated in the Work." Additionally, Part III permitted Fluor to "require additional inspections and tests."[1]

The BOA also included an indemnity provision, which is at issue in this case, under which MMR agreed to defend and indemnify Fluor for injuries "arising directly or indirectly out of [the BOA] or out of any acts or omissions of [MMR]":

> 28.1   [MMR] agrees to defend, indemnify and hold harmless [Fluor] and Owner, the affiliated companies of each, and all of their directors, officers, employees, agents and representatives, from and against any claim, demand, cause of action, liability, loss or expense arising: . . .
>
>> 28.1.3   From injury to or death of persons (including employees of [Fluor], Owner, [MMR] and [MMR]'s subcontractors) or from damage to or loss of property (including the property of

---

[1] An attachment following the BOA—titled "Quality Assurance and Control"—provided that "[MMR] has primary responsibility for quality" and was obligated "to implement the measures necessary to build quality into the work in accordance with the contract, drawings, and specifications." However, these obligations appeared under a heading describing "inspection and / or testing by [Fluor]." Moreover, the first provision stated that "[Fluor]-provided testing and inspection of [MMR]'s work will be identified in each Individual Release as applicable."

3

No. 13-30541

> [Fluor] or Owner) arising directly or indirectly out of this Contract or out of any acts or omissions of [MMR] or its subcontractors. [MMR]'s defense and indemnity obligations hereunder include claims and damages arising from non-delegable duties of [Fluor] or Owner or arising from use by [MMR] of construction equipment, tools, scaffolding or facilities furnished to [MMR] by [Fluor] or Owner. . . .

The indemnity provisions were to apply "regardless of whether the party to be indemnified was concurrently negligent." The BOA also obligated MMR to obtain several different types of insurance naming Fluor as an additional insured. The BOA's choice-of-law provision stated that the BOA must be interpreted in accordance with California law.

Although the BOA was the overarching base contract defining the rights and obligations of the parties with respect to MMR's work, MMR was neither authorized nor required to perform specific work until Fluor issued an Individual Release that contained a specific scope. On January 7, 2006, Fluor issued the Release describing MMR's haul-and-install work:

> [MMR] shall supply all supervision, labor, equipment, tools, materials, protective equipment and all items of expense necessary to perform the Work described below:
>
> > 1.1    Hauling and Installation services of Manufactured Homes, Travel Trailers, and Park Models as directed by [Fluor]'s representative throughout the state of Louisiana.

The Release incorporated certain exhibits, which set forth the specific tasks that MMR was required to complete. Those tasks included exterior installation, such as blocking and leveling the trailer, anchoring and strapping it, and installing it to sewer lines and gas lines. Additionally, MMR was required to make the trailer ready for occupancy, which included a duty to test certain appliances and appurtenances:

4

No. 13-30541

(a) Activate, test and make any necessary minor repairs to the refrigerator, range, furnace, air conditioner, and water heater for proper operations.  Adjust pilots and burners, change orifices, water heater elements, etc., as needed;

(b) Test smoke detector and replace if faulty.  Defective smoke detectors provided by FEMA or manufacturer upon receipt of damaged one; and

(c) Test exhaust fans for proper operation, repair as need.

## B.   MMR's Insurance Contracts

MMR insured its liabilities under the BOA by acquiring contractual-liability insurance under a commercial general-liability policy and an umbrella excess-liability policy with Liberty.  The general-liability policy defined as an insured any person or organization for whom MMR agreed to provide liability insurance, but only to the extent the insurance applies to personal injury or property damage arising out of MMR's work.  The excess-liability policy provided contractual-liability coverage only when "[a]ssumed in a contract or agreement that is an insured contract provided the bodily injury, property damage, personal injury or advertising injury occurs subsequent to the execution of the contract or agreement" and covered the assumption of another's "liability that would be imposed by law in the absence of any contract or agreement."

## C.   Events Leading Up to and Including the Trailer Fire

When MMR took possession of trailers from Fluor, the LP detectors were already installed in the trailers and MMR played no part in selecting or installing the devices. On July 14, 2006, MMR hauled and installed the trailer that would eventually be given to Jean Joseph, a hurricane survivor, and would subsequently give rise to this suit (the "Joseph trailer").  Once installation of the Joseph trailer was complete, Fluor employee Reginald McCoy and MMR employee Steven Stanley conducted a "Quality Control/Quality Assurance" ("QC/QA") inspection of the trailer.  At trial, Stanley testified that he could not

5

No. 13-30541

specifically recall the Joseph trailer inspection, but discussed what a routine QC/QA inspection entailed. He testified that it was not MMR's job to test the LP detector, but that he would sometimes perform various tasks, including testing the LP detector, at the request of the Fluor inspector; for instance, because the trailer was so small and Stanley was "right there" or because Stanley was in the way, and the Fluor inspector could not get to it. Some detector models lacked a test button, so if a Fluor inspector asked Stanley to test this type of detector, Stanley would use an ordinary cigarette lighter to release a stream of butane gas under the detector's sensor, which was the test Fluor selected based on the manufacturer's instructions.

The Joseph trailer had this model of detector. Although Stanley could not recall whether he had tested the Joseph trailer's LP detector, he stated that if he had and it had not alarmed, he would not have signed off on the trailer. At the end of the inspection, Stanley and McCoy both signed a "Unit Installation Work Authorization and Completion" form, listing the specific tasks that MMR had performed. The form made no mention of an LP detector. The form indicated that MMR had completed the work, and Fluor signed it indicating that it agreed that MMR had completed the work. After July 14, 2006, MMR had no further contact with or duties relating to the Joseph trailer and Fluor assumed physical control and responsibility for the trailer.

Five weeks later, on August 22, 2006, Fluor conducted a "lease-in" of the Joseph trailer, a necessary step before Jean Joseph could move in. A lease-in involved conducting an inspection of the trailer in the presence of the new occupant and generally explaining the trailer's basic functions. Fluor never

6

## No. 13-30541

contracted with MMR to do lease-ins; rather, Fluor retained this obligation.[2] As part of the standard lease-in, a Fluor inspector would perform certain tests to determine that the electricity was connected, that the propane-gas system was not leaking, and that all alarms—including the LP detector—were working properly. Additionally, the Fluor inspector would connect the gas tanks and check the gas appliances, igniting the burners on the stove and in the oven, lighting the furnace, and lighting the water heater. Documentation from the lease-in of the Joseph trailer indicates that Fluor performed a leak test on the LP gas system and determined that it did not leak. The documentation also indicates that Fluor tested the trailer's range and LP detector, and both appeared to be functioning properly. The Fluor employee who conducted the lease-in testified that he lit the gas burners in the trailer, tested the LP detector with a butane lighter as suggested by the manufacturer, and performed a gas-pressure test, which involved turning on the gas valve on the stove top.

On August 25, 2006, three days after the lease-in, Joseph and her friend, Bernard Mabry II, entered the trailer and smelled gas. Joseph testified at her deposition that Mabry went to the stove, at which point the fire erupted. Joseph heard no alarm when she entered the trailer. The New Orleans Fire Department concluded that one of the knobs on the stove had been left in an open position since August 22, 2006 (the day of the lease-in) and that Mabry had inadvertently ignited the accumulated gas when he turned a knob on the stove in an attempt to shut the gas off. The Bureau of Alcohol, Tobacco, and Firearms reached substantially the same conclusion. Both Joseph and Mabry

---

[2] Although the BOA provided that "[MMR] shall be available for move-in inspection," there is no indication in the record or briefing that MMR was required to be available for the Joseph trailer lease-in.

7

No. 13-30541

suffered serious burns from the flash fire and Mabry ultimately died from his injuries.

## D.    The Joseph and Mabry Suits

After the fire, Mabry's estate and Joseph both sued several parties in Louisiana state court, including Fluor and MMR.  Mabry's estate and Joseph alleged that employees at either Fluor or MMR had failed to turn off one of the gas stovetop burners in the trailer before turning it over to Joseph, failed to ensure that the stovetop was functioning properly, and failed to ensure that the trailer's LP detector, which did not alarm on the day of the fire, was functioning properly.  Fluor, Fluor's insurers (including Westchester), MMR, and MMR's insurer (Liberty) agreed to settle Joseph's claims against Fluor and MMR for $10 million, with the insurers reserving various rights to recover from one another the sums paid in the settlement.  The insurers later agreed to settle Mabry's claims against Fluor and MMR for a total of $2.75 million, again reserving certain rights to recover from one another.

## E.    The Proceeding Below

The insurance-coverage dispute giving rise to this appeal followed. Liberty (MMR's insurer) sued Fluor's insurers (including Westchester[3]) in federal court to recover $4.375 million in settlement payments, and Westchester (Fluor's insurer) counterclaimed to recover its own settlement contributions from Liberty.  Liberty argued that MMR was not responsible for the fire and owed Fluor no indemnity, and so Fluor's insurers (including Westchester) should reimburse Liberty for the settlement payments it had made.  Westchester argued the reverse.  Following a bench trial, the district

---

[3] Westchester is the only one of Fluor's insurers that remains a party to this suit.

8

No. 13-30541

court ruled in Liberty's favor. It held that MMR was not required to indemnify Fluor based on the BOA's indemnity provision and the facts of the underlying tort suit. Interpreting the indemnity provision under California law, the district court concluded that, to trigger MMR's indemnity obligation, Fluor was required to show a "but-for causal connection between the ultimate harm and [MMR's] duties under the contract." Applying this standard, the district court determined that nothing in the scope of MMR's work was a but-for cause of Joseph's and Mabry's injuries. Specifically, the court found that the fire was caused by an accumulation of gas in the trailer due to someone leaving the stovetop's gas knob on. Significantly, the court found that "there was no evidence that connected MMR's contract to the open gas knob on the stove" because "MMR had no contact with the trailer for five weeks before the fire, and Stanley [MMR's employee] disconnected the propane source when he finished the QC/QA inspection." The district court also concluded that the failure of the trailer's LP detector to alarm contributed to the injuries.

The court pointed out, however, "[t]hat the LP detector's failure was a contributing cause of the fire does not mean that the fire arose directly or indirectly out of the BOA unless MMR's work under the contract was a but-for cause of the injuries." Examining the extensive BOA and its accompanying documents, the district court noted that the BOA contains no mention of the LP detector, much less an obligation on MMR's part to test it. The district court acknowledged that a separate Fluor document, the "QC/QA RFO Checklist" listed various requirements for Fluor's inspectors, including ensuring that the "LP detector [is] installed and operates correctly," but pointed out that this document was meant to apply to Fluor—not MMR—inspectors and was not incorporated into the BOA. Indeed, the district court determined that the BOA's integration clause further foreclosed a finding that the QC/QA RFO Checklist was binding on MMR. Thus, the district court held

9

## No. 13-30541

that testing the LP detector was outside the scope of the BOA and therefore the fire did not arise directly or indirectly out of the BOA.

In the alternative, the district court stated that, even if testing the LP detector had been within the scope of MMR's work under the BOA, MMR's obligation would have been limited to conducting the butane lighter test, which the court found would not have indicated that the LP detector was defective. Because the test would not have prevented the fire, the district court refused to find a causal connection between an obligation to perform the test and the injuries Joseph and Mabry sustained. Accordingly, the district court determined that, even in this alternative, the fire could not be said to have "arisen" out of the BOA, which forecloses Fluor's indemnity claim.

## II.    STANDARD OF REVIEW

"We review a district court's bench trial conclusions of law"—including issues of contract interpretation—"*de novo* and its findings of fact for clear error." *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).

## III.    DISCUSSION

Westchester (Fluor's insurer) argues that it has no obligation to reimburse Liberty (MMR's insurer) for the payments Liberty made to settle the Mabry and Joseph lawsuits. Westchester does not argue that it has no such obligation because MMR was itself liable for Joseph's and Mabry's injuries under tort law. Instead, Westchester argues that it has no obligation to reimburse Liberty because MMR had a duty to indemnify Fluor against the Joseph and Mabry lawsuits. In support of this contention, Westchester argues that MMR had a duty to indemnify Fluor both pursuant to the indemnity provision of the BOA and pursuant to the additional-insured provisions of MMR's insurance policies with Liberty. Westchester is wrong on both points.

10

No. 13-30541

## A. Indemnity under the BOA

Liberty claims that Westchester must reimburse it for the settlement payments it made on MMR's behalf because MMR was not responsible for the fire in the Joseph trailer. Westchester responds that MMR agreed to indemnify Fluor pursuant to the BOA's indemnity provision and therefore that Liberty must reimburse Westchester for its settlement payments. The BOA's indemnity provision states that "[MMR] agrees to defend, indemnify and hold harmless [Fluor] . . . from and against any claim, demand, cause of action, liability, loss or expense . . . arising directly or indirectly out of [the BOA] or out of any acts or omissions of [MMR]." Westchester contends that the Joseph and Mabry lawsuits triggered this indemnity provision because the injuries resulting from the trailer fire arose "directly or indirectly out of [the BOA] or out of any acts or omissions of [MMR]." Liberty argues that the indemnity provision was not triggered because none of MMR's acts, omissions, or obligations under the BOA bore any connection to the trailer fire. We agree.

Under California law—the law governing the BOA—Westchester, as the party seeking to enforce the BOA's indemnity provision, has the burden to prove that the indemnity provision was triggered, *i.e.*, that MMR was obligated to indemnify Fluor. *See Four Star Electric, Inc. v. F & H Constr.*, 10 Cal. Rptr. 2d 1, 3 (Cal. Ct. App. 1992) ("An indemnitee seeking to recover on an agreement for indemnification must allege the parties' contractual relationship, the indemnitee's performance of that portion of the contract which gives rise to the indemnification claim, the facts showing a loss within the meaning of the parties' indemnification agreement, and the amount of damages sustained."). California courts have interpreted indemnity provisions that use the phrase "arising . . . out of" to require at least a but-for connection between the alleged harm and the indemnitor's contractual obligations. *See, e.g., Transcon. Ins. Co. v. Ins. Co. of the State of Penn.*, 56 Cal. Rptr. 3d 491, 499 (Cal. Ct. App.

11

No. 13-30541

2007) ("Although the phrase 'arising out of' should be broadly read to require only a minimal causal connection, it requires more than 'but for' causation.").[4] Similarly, California courts construe language equivalent to "arising directly or indirectly" out of a contract to require causation. *See Centex Golden Constr. Co. v. Dale Tile Co.*, 93 Cal. Rptr. 2d 259, 262, 264 (Cal. Ct. App. 2000) (interpreting an agreement to indemnify "with respect to all work which is covered by or incidental to this subcontract" as requiring "some connection between the subcontractor's work and the claim"); *Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*, 61 Cal. Rptr. 2d 668, 670 (Cal. Ct. App. 1997) (stating that indemnity obligation for a loss that "arises out of or is in any way connected" with the performance of work requires proof of causation).

In this case, the district court determined that the fire was caused by (1) someone—but not MMR—having left the gas on in the trailer for approximately three days before the fire and (2) the LP detector failing to alarm. Westchester does not suggest that MMR could owe Fluor indemnity if the sole cause of the fire had been that someone left one of the gas burners on. Accordingly, for the fire to have arisen directly or indirectly out of either the BOA or MMR's acts or omissions, there must have been a connection between MMR's acts, omissions or obligations under the BOA and the LP detector's failure to alarm. Westchester argues that MMR's purported obligations to test the LP detector and ensure general trailer quality supply the requisite

---

[4] Westchester criticizes the district court for focusing on whether MMR's own negligence caused the detector to fail. Under California law, as the district court itself pointed out, "courts will enforce indemnity agreements even for losses caused by acts over which the indemnitor had no control." *Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*, 61 Cal. Rptr. 2d 668, 670 (Cal. Ct. App. 1997). Westchester does not suggest the fire can be attributed to MMR's negligence, but the operative question is whether there exists a connection between the fire and MMR's obligations under the BOA such that the fire can be said to have arisen, directly or indirectly, out of the BOA.

12

## No. 13-30541

connection. Westchester's argument, however, is not supported by either the evidence or the case law.

Westchester concedes that the BOA did not specifically require MMR to test the LP detector. In support of its claim, Westchester instead points to the BOA's general provisions instructing MMR to install the trailers as directed by Fluor and to conduct any additional tests or inspections that Fluor required. Westchester alleges that MMR had a specific obligation to test the LP detector by virtue of a separate document, the QC/QA RFO Checklist, which included the item "LP detector installed and operates properly." At trial, one of Fluor's program managers testified that Fluor had provided MMR the QC/QA RFO Checklist before MMR bid on the haul-and-install contract. The district court concluded, however, that the checklist had never been incorporated into the BOA. Fluor's failure to incorporate the checklist severely undermines Westchester's position, particularly because the BOA contained a merger clause, stating that the BOA, together with its attachments, exhibits and drawings, "sets forth the entire Contract and agreement between the Parties pertaining to the Scope of Work . . . and supersedes all inquiries, proposals, agreements, negotiations and commitments[] . . . prior to the date of execution of this Contract, pertaining to said Work or this Contract." The mere fact that Stanley (the MMR employee who conducted a quality control inspection of the Joseph trailer) or other MMR inspectors occasionally performed certain tasks that happened to be on the checklist did not transform the checklist into a contractual obligation. Indeed, the QC/QA RFO checklist was a document used by Fluor's, not MMR's, employees.

Westchester responds that the BOA permitted Fluor to "require additional inspections and tests," and therefore argues that the QC/QA RFO checklist was incorporated into the BOA as such an "additional inspection[] [or] test[]" that Fluor could insist upon. The question then becomes whether

13

No. 13-30541

the checklist—or any other evidence—reflects that Fluor in fact requested MMR to test the LP detector in the Joseph trailer. The evidence in the record indicates that Fluor did not. First, Stanley (MMR's inspector) testified that MMR was not required to test the LP detector. Second, although Stanley testified that he would sometimes perform certain tasks that he was not required to perform, including testing the LP detector, he explained that he would do so at the request of the Fluor inspector because Stanley was "right there" or because Stanley was in the way, and the Fluor inspector could not get to it. Stanley's testimony thus indicates that he would sometimes test a trailer's LP detector, but for the sake of convenience, not because he was required to do so as part of MMR's work arising out of the BOA. Furthermore, that the BOA permitted Fluor to require additional testing or inspection does not mean that individual Fluor inspectors, on an ad-hoc basis, were authorized to impose such requirements on MMR or its inspectors. Third, although Stanley testified that, based on documentation from the inspection, someone tested the LP gas detector, he did not confirm that he had in fact been the one who tested it. Given its burden to prove indemnity, *see Four Star Electric*, 10 Cal. Rptr. 2d at 3, Westchester's failure to cite to record evidence indicating that it in fact required MMR to test the detector in the Joseph trailer is fatal to its argument. Accordingly, the district court did not err when it determined that MMR was not required to test the LP gas detector.[5]

Westchester also argues that MMR assumed the responsibility to ensure that trailers had properly-functioning LP detectors by virtue of its general

---

[5] In the alternative, the district court concluded that, even if MMR had been obligated to test the LP gas detector, testing would not have made a difference in exposing the detector's latent defect and preventing the fire. Because we conclude that MMR was not required to test the LP detector, we do not consider Liberty's argument that we should affirm on this further ground.

14

## No. 13-30541

obligation to assure quality. The BOA stated that MMR "has primary responsibility for quality. [MMR] is to implement the measures necessary to build quality into the work in accordance with the contract, drawings, and specifications." The "work" for which MMR had the responsibility to ensure quality, as described in the "Travel Trailer Installation" exhibit to the specific Individual Release relevant here, consisted primarily of towing the FEMA trailers, levelling the ground for installation, transferring them onto concrete piers, anchoring them, installing sewer and water lines, connecting electrical service, filling propane tanks, constructing wooden steps to the front door, and generally making the trailer ready for occupancy. This was the work whose quality MMR ensured. Although MMR's work was mostly limited to transporting the trailers, installing them and connecting utilities, MMR's obligation to make the trailers ready for occupancy did include some testing of appliances and appurtenances. One of MMR's few obligations in this respect was to "[t]est smoke detector and replace if faulty." While the work release specifically obligated MMR to test smoke detectors, it included no obligation to test LP detectors. If Fluor had wished to create such an obligation, it could have done so easily. *See, e.g.*, *White v. W. Title Ins. Co.*, 710 P.2d 309, 314 & n.4 (Cal. 1985) (applying the familiar principle that the inclusion of one thing implies exclusion of others to contract interpretation). We will not add an obligation to test LP detectors where Fluor, the party that drafted the BOA, chose not to. Thus, since MMR's "work" under the BOA was unrelated to the LP detectors, MMR's general obligation "to build quality into the work" did not include an obligation to ensure that the LP detectors functioned properly.

Finally, the two cases on which Westchester seeks principally to rely— *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 124 Cal. Rptr. 2d 818 (Cal. Ct. App. 2002), and *Continental Heller*—instead support Liberty's position. In *St. Paul*, the court concluded that a subcontractor had

15

no duty to indemnify the general contractor based on the terms of the parties' agreement. *See* 124 Cal. Rptr. 2d at 830. The contract between the parties required the subcontractor to indemnify the general contractor for claims "arising out of or resulting from the performance of the Work, either directly or indirectly" so long as the claim "arises from or is alleged to have arisen in whole or in part by any act or omission of Subcontractor or any subcontractor under him." *Id.* at 821-22. There, an explosion occurred while the general contractor was pressure testing a pipe, which resulted in injuries to an employee of the subcontractor. *Id.* at 822. The general contractor's insurer sought indemnity from the subcontractor's insurer, arguing that the subcontract's indemnity provision covered the injuries. *Id.* at 822-23.

The court reasoned that the subcontractor "expressly undertook no duty to indemnify [the general contractor] except for a liability that arose from an 'act or omission' by [the subcontractor] *during the performance of the work called for by the Subcontract*." *Id.* at 828. "Such language," the court said, "can have no other meaning or purpose than to limit the scope of [the subcontractor]'s indemnity to injuries occurring in circumstances over which it has at least *some* control and where it is engaged in activity that is causally related in some manner to the injury for which indemnity is claimed." *Id.* "On the record before us," the court explained, "not only is there no basis for finding [the subcontractor] at *fault* for [the] injury, but also [the subcontractor] did *not* do *any* act that was in any way connected to such injury." *Id.* at 829. Consequently, the court concluded that the subcontractor's duty to indemnify "was never triggered." *Id.* at 830.

Liberty concedes that the BOA's indemnity provision is broader than the language at issue in *St. Paul*. The BOA requires that MMR indemnify Fluor not only for claims arising out of MMR's own "acts or omissions," but also for claims arising directly or indirectly out of the BOA itself. Nevertheless,

No. 13-30541

because the connection between MMR's duties and the fire is weaker—MMR completed its work with respect to the trailer five weeks before the fire occurred—Liberty reasons that *St. Paul* supports its position. We agree. Like in *St. Paul*, there is no evidence that MMR was "at *fault* for [the] injury" or did "*any* act that was in any way connected to such injury." 124 Cal. Rptr. 2d at 829. Westchester's argument, then, depends on asserting that MMR, under the BOA, was responsible for installing trailers with properly functioning LP detectors. However, as previously discussed, the evidence indicates that MMR was not required to test the LP detector in the Joseph trailer. Accordingly, *St. Paul* better supports Liberty's position than Westchester's.

In *Continental Heller*, the general contractor hired the subcontractor to install an ammonia refrigeration system in an Oscar Meyer meat-packing plant. 61 Cal. Rptr. at 669. Following the installation, "an explosion occurred at the plant causing property damage and injuring several Oscar Meyer employees." *Id.* "The explosion was caused by the failure of a valve . . . [selected and] installed by [the subcontractor] in the course of its work on the refrigeration system." *Id.* at 669, 671. The court considered whether the subcontractor was obligated to indemnify the general contractor under an agreement that required indemnification for "a loss which '*arises out of or is in any way connected* with the performance of work under th[e] Subcontract,'" including "*any acts or omissions*[] . . . on the part of Subcontractor." *Id.* at 670. "[The subcontractor] d[id] not deny its installation of the valve in the refrigeration plant was 'an act' carried out in 'the performance of work under [the] Subcontract.'" *Id.* (third alteration in original). "Nor d[id] it deny the loss suffered by [the general contractor] was 'in any way connected' with that act." *Id.* "Therefore," the court concluded, "under the contract as written, [the general contractor] is entitled to indemnity from [the subcontractor] for its losses." *Id.* The court, however, noted that,

17

No. 13-30541

> [c]ontrary to [the subcontractor]'s contention, the causal connection defined in the agreement does not impose virtually unlimited liability on [it]. [The subcontractor]'s liability must be connected to an "act" or "omission" in the performance of its subcontract, not merely to the performance itself. Therefore, the fact [the subcontractor] installed the refrigeration system in the plant would not make it liable for indemnity for the loss incurred in paying damages to someone who suffered food poisoning from eating an Oscar Meyer hot dog on the theory that but for the refrigeration system Oscar Meyer could not have made the hot dog. The indemnitee in this hypothetical case would have to establish the loss was in some way connected to a specific act or omission of [the subcontractor].

*Id.* at 672.

In this case, by contrast, MMR neither selected nor installed the faulty detector. In other words, unlike the subcontractor in *Continental Heller*, MMR performed no work under the BOA that was in any way connected to the injuries. Westchester's argument to the contrary depends on the assertion, which is not borne out by the record, that MMR was responsible for inspecting and assuring the quality of the LP detector. Admittedly, Westchester also notes that, under the BOA, MMR was primarily responsible for assuring the quality of the trailers it hauled and installed, which, according to Westchester, "necessarily encompasses the quality of the trailer's critical safety devices." Certainly, the fire in the Joseph trailer would not have occurred had MMR not hauled and installed the trailer, as required by the BOA. But to conclude that MMR owes Fluor indemnity under this reasoning would run afoul of the *Continental Heller* court's admonition that the subcontractor would not be "liable for indemnity for the loss incurred in paying damages to someone who suffered food poisoning from eating an Oscar Meyer hot dog on the theory that but for the refrigeration system Oscar Meyer could not have made the hot dog." *Id.* Even under the but-for test, indemnity requires a closer connection than that to find that "a loss . . . '*arises out of or is in any way connected* with the

18

performance of work under th[e] Subcontract.'"   *See id.* at 670, 672. Westchester acknowledges as much by conceding that it "could not seek indemnification on the attenuated theory that but for the fact of the trailer's installation, there would have been no oven knobs to mishandle, and hence no fire and no injuries," but argues indemnification is required here because the trailer was installed with a faulty LP detector, which MMR had a duty under the BOA to test "for the very purpose of avoiding the harm that later occurred." Since, however, the BOA assigned no such duty to MMR, the connection between MMR's obligation to install the Joseph trailer and the subsequent fire is just as attenuated as the subcontractor's installation of the faulty valve and the hypothetical spoiled hot dog in *Continental Heller.*

Ultimately, the record evidence and case law on which Westchester seeks to rely supports the district court's conclusion that the BOA did not obligate MMR to test the trailer's LP detector and that, therefore, neither the BOA itself nor any act or omission on the part of MMR was a but-for cause of the injuries. Westchester's arguments to the contrary are unavailing.

## B. Indemnity under MMR's Insurance Policies

Aside from the indemnification provision in the BOA, Westchester also argues that MMR had a separate obligation to indemnify Fluor pursuant to MMR's insurance policies with Liberty, which are interpreted under Louisiana law. Westchester, as Fluor's insurer, had the burden of proving that Fluor was entitled to coverage as an additional insured under MMR's insurance policies with Liberty. *See, e.g., Tunstall v. Stierwald,* 809 So. 2d 916, 921 (La. 2002). Specifically, MMR's excess-liability policy with Liberty provided that coverage for an insured "included in or added to an underlying policy" would not be broader "than is available to such insured under the underlying policy." Further, the blanket additional-insured provision in the underlying policy—

19

No. 13-30541

MMR's commercial general-liability policy with Liberty—limited coverage to injury arising out of "[MMR's] work."

Westchester argues that MMR's work under the BOA specifically included the installation of trailers with working LP gas detectors. However, as previously discussed, the record does not support this contention. The general-liability policy also defined "[MMR's] work" to include "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of '[MMR's] work.'" Westchester reasons that because the BOA provided that "[MMR] has primary responsibility for quality" and was obligated "to implement the measures necessary to build quality into the work in accordance with the contract, drawings, and specifications," the district court erred when it concluded that MMR made no warranties with respect to its work that occasioned the injuries. However, as discussed previously, *see supra*, note 1, these obligations related to "inspection and / or testing by [Fluor]," which, if required, would be identified in an Individual Release. For the same reason, Westchester's arguments that MMR was obligated to test the LP detector based on MMR's "general responsibility to ensure trailer quality," also fails. Accordingly, we affirm the judgment of the district court in this regard.

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment that MMR was under no obligation to indemnify Fluor and that Fluor was not covered as an additional-insured pursuant to MMR's insurance policies with Liberty.